**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **SWATI DEY** | : | |
| 2909 Burch Avenue | : | |
| Nashville, TN 37203 | : | Case No. 1:23-cv-584 |
| | : | |
| Plaintiff, | : | Judge _____ |
| | : | |
| v. | : | |
| | : | |
| **JOHN C. BYRD** | : | |
| 3458 Observatory Place | : | |
| Cincinnati, OH 45208 | : | **COMPLAINT FOR MONEY** |
| | : | **DAMAGES AND PERMANENT** |
| and | : | **INJUNCTIVE RELIEF WITH JURY** |
| | : | **DEMAND** |
| **SAKTHIVEL SADAYAPPAN** | : | |
| 3843 Blackwood Court | : | |
| Cincinnati, OH 45236 | : | |
| | : | |
| Defendants. | : | |

Plaintiff Swati Dey complaining of Defendants John C. Byrd and Sakthivel Sadayappan states as follows:

**PARTIES**

1. Plaintiff Swati Dey is a resident and citizen of the State of Tennessee.

2. Defendant John C. Byrd is a resident and citizen of the State of Ohio.

3. Defendant Sakthivel Sadayappan is a resident and citizen of the State of Ohio.

**JURISDICTION AND VENUE**

4. This Court has personal jurisdiction over Defendants, who are residents and citizens of Hamilton County, Ohio within this District.

1

5. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and the parties have diversity of citizenship.

6. Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) because Defendants reside in this District and pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the conduct giving rise to this Complaint occurred in this District.

## FACTUAL ALLEGATIONS

7. Plaintiff Swati Dey, PhD, is an Assistant Professor of Medicine on the tenure track in the Division of Clinical Pharmacology of the Department of Internal Medicine at Vanderbilt University Medical Center.

8. Assistant Professors are charged with finding their own funding sources to pay their salaries.

9. Dr. Dey's salary was funded through the Department of Defense.

10. Dr. Dey researches the use of gene therapy and device-based stimulation to reduce chronic elevation of sympathetic nerve activity and prevent heart failure and death.

11. Dr. Dey has engaged in this research for approximately 10 years.

12. Shortly after Dr. Dey was hired by Vanderbilt University on May 1, 2019, she received $2.5 million in grant funds to support her salary and research and to develop new intellectual property related to her research. This included the creation of medical devices, similar to pacemakers, that could be implanted into living organisms to monitor and regulate cardiac activity for improving health outcomes.

13. On or around July 1, 2019, Vanderbilt University contracted the University of Cincinnati College of Medicine ("UC"), to conduct intensive research on her devices in live

animal test subjects at UC's Department of Internal Medicine. The contract included creating a centralized "perpetual" database at UC to organize, store and provide continuous access to Dr. Dey's research including her data collected from her tenure at Johns Hopkins University, Vanderbilt University, and UC.

14. Dr. Dey's grant funds were partly used to pay UC and external companies to perform the contracted work at UC's Department of Internal Medicine, and Dr. Dey was charged with overseeing the entire project.

15. By 2022, Dr. Dey and her colleagues at UC and other institutions agreed that UC was not meeting its requirements pursuant to their contract. These colleagues included Deeptankar DeMazumder, MD, PhD, and Benjamin Vaughan, PhD who were working on the project at UC.

16. Dr. Dey indicated to UC that she would be terminating the contract on the basis that UC was not delivering its contractual requirements.

17. Thereafter, John C. Byrd, MD, Department Chair of Internal Medicine at UC contacted Dr. Kimryn Rathmell, Department Chair of Vanderbilt University's Department of Internal Medicine and Dr. Dey's supervisor.

18. Upon information and belief, Dr. Byrd contacted Dr. Rathmell multiple times.

19. In his communications with Dr. Rathmell, Dr. Byrd accused Dr. Dey of:

- Trespassing on UC property;

- Engaging in illegal activity;

- Inappropriate relationships in her personal life; and

- Impropriety related to her federal funding through her Department of Defense grants.

3

20. Each of these accusations is false.

21. Dr. Byrd made these allegations against Dr. Dey knowing that each accusation was false.

22. Dr. Dey was ultimately exonerated by Vanderbilt University's investigations into these false accusations but by that time, irreversible damage had already occurred to Dr. Dey's career and reputation.

23. Thereafter, Dr. Byrd and Dr. Sadayappan, Associate Chair of UC's Department of Internal Medicine, knowingly reiterated the false accusations against Dr. Dey to multiple individuals including but not limited to students, trainees, colleagues, partners, publishers, funding agencies, journal editors, grant reviewers, and prospective employers.

24. Dr. Byrd and Dr. Sadayappan instructed students and collaborators of Dr. Dey to stop working on Dr. Dey's research including but not limited to Dr. Vaughan.

25. When Dr. Vaughan refused to stop his work on Dr. Dey's research, Dr. Byrd took steps to terminate Dr. Dey's research including by contacting Dr. Vaughan's supervisor and repeating the false accusations.

26. Dr. Sadayappan reiterated the false allegations against Dr. Dey to journal editors including but not limited to Joseph A. Hill, MD, PhD, Editor of the journal "Circulation" who subsequently refused to publish Dr. Dey's manuscript in the journal after an atypical and biased review process.

27. Dr. Sadayappan reiterated the false allegations against Dr. Dey to individuals at professional meetings including without limitation the 2nd Olympiad in Cardiovascular Medicine attended by prominent leaders in Dr. Dey's field.

28. Dr. Sadayappan reiterated the false allegations against Dr. Dey to individuals at UC including without limitation Dr. Vaughan; Eric P. Smith, MD; Phillip Owens, PhD; Kevin Haworth, PhD; Onur Kanisicak, PhD; Michael Tranter, PhD; and Jack Rubinstein, MD.

29. On or around September 28, 2022, Dr. Byrd's and Dr. Sadayappan's false accusations were memorialized in a formal complaint, which Defendants caused to be filed with Vanderbilt.

30. As a result of Dr. Byrd's and Dr. Sadayappan's false accusations, Vanderbilt University shut down Dr. Dey's research.

31. Dr. Byrd and Dr. Sadayappan caused the false accusations to be reiterated to external funding agencies including but not limited to the Department of Defense.

32. Because of the false accusations, Vanderbilt University has informed Dr. Dey that she must find a new position with another university or seek another career.

33. Because of the false accusations, Vanderbilt University has informed Dr. Dey that she will not be granted tenure.

34. Because of the false accusations, UC locked up Dr. Dey's data in direct violation of UC's contractual obligations.

35. Because Dr. Dey's research was paused while the false accusations were investigated and UC locked up Dr. Dey's data and equipment at UC, she has been unable to publish her research; publish, analyze, or utilize research data; renew or apply for new grant funding to support her salary and research; or in any way progress in her research.

36. Upon information and belief, Dr. Byrd and/or Dr. Sadayappan have interfered with Dr. Dey's research such that the animal test subjects participating in her research have been slaughtered; her trainees and collaborators abandoned her research project; new hardware and

software comprising intellectual property were locked up at UC; equipment purchased with her grant funds were locked up at UC; her lab has been un-staffed and shut down; and ten years of Dr. Dey's research results have been destroyed or withheld from Dr. Dey's possession.

37. Because Dr. Byrd and Dr. Sadayappan have interfered with Dr. Dey's research she has been unable to use her intellectual property to create business and to progress her patent applications.

38. Colleagues with similar research designs have used their intellectual property to develop medical businesses valued at $33 million.

39. Upon information and belief, Dr. Sadayappan has attended medical conferences across the world and repeated the false accusations, such that Dr. Dey has been blacklisted from career opportunities.

40. Upon information and belief, Dr. Byrd and Dr. Sadayappan have repeated their false accusations to their own and Dr. Dey's colleagues, mentors, and students.

41. Upon information and belief, Dr. Byrd and Dr. Sadayappan have repeated their false accusations to Dr. Dey's publication reviewers for peer reviewed journals.

42. Upon information and belief, Dr. Byrd and Dr. Sadayappan have repeated their false accusations to the entities that regulate Dr. Dey's field of research for future employers.

## COUNT I
### (Defamation Per Se)

43. Plaintiff realleges the foregoing paragraphs as if fully rewritten herein.

44. Defendants knowingly and/or intentionally made false and defamatory statements about Dr. Dey, including but not limited to allegations that she engaged in criminal activity, accusations that she engaged in improper relationships as a professor, and accusations that she engaged in impropriety in her research.

6

45. Defendants published these statements to numerous third parties, including but not limited to Dr. Rathmell, Dr. Vaughan, Vanderbilt University, the University of Cincinnati, the Department of Defense, students, colleagues, publishers, and attendees of medical conferences.

46. Defendants published these statements negligently, recklessly, and/or with actual malice.

47. Defendants' false statements impugned Dr. Dey's professional reputation, reflected negatively upon her character, and have injured her in her profession.

48. As a direct and proximate result of Defendants' conduct, Dr. Dey has suffered injury, including but not limited to injuries to her reputation and livelihood, loss of research data, loss of publications, loss of intellectual property, loss of business opportunities, loss of employment opportunities, loss of promotional and tenure opportunities, and loss of wages as well as per se injuries.

49. Defendants' actions entitle Dr. Dey to compensatory damages, special damages, punitive damages, and attorneys' fees and costs.

## COUNT II
### (Defamation Per Quod)

50. Plaintiff realleges the foregoing paragraphs as if fully rewritten herein.

51. Defendants knowingly and/or intentionally made false and defamatory statements about Dr. Dey, including but not limited to allegations that she engaged in criminal activity, accusations that she engaged in improper relationships as a professor, and accusations that she engaged in impropriety in her research.

52. Defendants published these statements to numerous third parties, including but not limited to Dr. Rathmell, Dr. Vaughan, Vanderbilt University, the University of Cincinnati, the Department of Defense, students, colleagues, publishers, and attendees of medical conferences.

53. Defendants published these statements negligently, reckless, and/or with actual malice.

54. Defendants' false statements impugned Dr. Dey's professional reputation, reflected negatively upon her character, and have injured her in her profession.

55. As a direct and proximate result of Defendants' conduct, Dr. Dey has suffered injury, including but not limited to injuries to her reputation and livelihood, loss of research data, loss of publications, loss of intellectual property, loss of business opportunities, loss of employment opportunities, loss of promotional and tenure opportunities, and loss of wages as well as per se injuries.

56. Defendants' actions entitle Dr. Dey to compensatory damages, special damages, punitive damages, and attorneys' fees and costs.

### COUNT III
### (Tortious Interference with a Contract)

57. Plaintiff realleges the foregoing paragraphs as if fully rewritten herein.

58. Dr. Dey had contractual relationships with Vanderbilt University, the University of Cincinnati, and the Department of Defense.

59. Defendants were aware of the foregoing contractual relationships.

60. Defendants intentionally interfered with the foregoing contractual relationships by impugning Dr. Dey and her professional and personal reputation. The conduct harmed Dr. Dey's relationships with current and future employers, students, trainees, partners, colleagues, publishers, funding agencies, grant reviewers and regulatory bodies.

61. As a direct and proximate result of Defendants' conduct, Defendants have interfered with or caused parties to be in breach of their contracts with Dr. Dey, who is entitled to relief, including but not limited to compensatory damages.

## COUNT IV
**(Tortious Interference with Business Relationship)**

62. Plaintiff realleges the foregoing paragraphs as if fully rewritten herein.

63. Dr. Dey had business relationships with Vanderbilt University, the University of Cincinnati, the Department of Defense, peer-reviewed journals, and prospective future employers at other University medical departments.

64. Defendants were aware of the foregoing business relationships.

65. Defendants, without a privilege to do so, intentionally interfered with the foregoing business relationships by impugning Dr. Dey and her professional and personal reputation. The conduct harmed Dr. Dey's relationships with current and prospective employers, partners, colleagues, publishers, and funding sources.

66. As a direct and proximate result of Defendants' conduct, Dr. Dey has suffered damages, including loss of research data, loss of publications, loss of intellectual property, loss of business opportunities, loss of employment opportunities, and loss of tenure, and is entitled to relief.

## COUNT V
**(Conversion)**

67. Plaintiff realleges the foregoing paragraphs as if fully rewritten herein.

68. By their conduct, Defendants have and continue to wrongfully control or exercise dominion over property belonging to Dr. Dey against the wishes of Dr. Dey.

69. Dr. Dey has ownership over her research data and materials that UC was contracted to provide and those she had provided to UC to create the centralized perpetual repository.

70. Defendants have wrongfully converted this property and/or wrongfully destroyed this property.

71. As a direct and proximate result of Defendants' conduct, Dr. Dey has suffered damages and is entitled to relief.

## COUNT VI
### (False Light)

72. Plaintiff realleges the foregoing paragraphs as if fully rewritten herein.

73. Defendants gave publicity to a matter concerning Dr. Dey that placed Dr. Dey before the public in a false light.

74. The false light in which Dr. Dey was placed by Defendants would be highly offensive to a reasonable person.

75. Defendants acted with actual malice. Defendants had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which Dr. Dey would be placed.

76. As a direct and proximate result of Defendants' conduct, has and will continue to suffer significant damages, including injuries to her reputation and livelihood, loss of research data, loss of publications, loss of intellectual property, loss of business opportunities, loss of employment opportunities, loss of promotional and tenure opportunities, and loss of wages.

## COUNT VII
### (Permanent Injunction)

77. Plaintiff realleges the foregoing paragraphs as if fully rewritten herein.

78. The future harm to Dr. Dey's reputation, livelihood, occupation and career, and emotional wellbeing will be irreparable and incapable of being remedied by money damages if Defendants are allowed to continue to publish their false and defamatory statements.

79. Dr. Dey is entitled to a permanent injunction prohibiting Defendants from continuing to publish their false and defamatory statements, and requiring Defendants to correct

misstatements and misinformation that has been presented to third-parties including but not limited to UC, Vanderbilt University, the Department of Defense, and publishers.

**WHEREFORE**, Plaintiff Swati Dey demands judgment against Defendants as follows:

(a) That Plaintiff be awarded all lost pay, front pay and benefits;

(b) That Plaintiff be awarded compensatory damages;

(c) That Plaintiff be awarded punitive damages;

(d) That Plaintiff be awarded liquidated damages;

(e) That Plaintiff be awarded pre-judgment and post-judgment interest;

(f) That Plaintiff be compensated for the adverse tax consequences of receiving a lump sum award rather than her compensation over several, separate tax years;

(g) That Plaintiff be awarded reasonable attorneys' fees;

(h) That Plaintiff be awarded costs;

(i) That Plaintiff be awarded a permanent injunction enjoining Defendants from continuing to publish the false and defamatory statements regarding Dr. Dey and requiring Defendants to remove or retract and correct any defamatory statements that Defendants have published to third-parties; and

(j) That Plaintiff be awarded all other legal and equitable relief to which she May be entitled.

Respectfully submitted,

/s/ *Paige E. Richardson*
Paige E. Richardson (OH: 0102380)
George M. Reul, Jr. (OH: 0069992)
FREKING MYERS & REUL LLC
600 Vine Street, Ninth Floor
Cincinnati, OH 45202
513-721-1975/Fax: 513-651-2570
*prichardson@fmr.law*
*greul@fmr.law*

Attorneys for Plaintiff

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues so triable.

/s/ *Paige E. Richardson*